UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-07-70-B-W |
| | ) | |
| TAMMY LEVESQUE | ) | |

**ORDER OVERRULING OBJECTIONS TO MOTION FOR FORFEITURE**

Tammy Levesque pleaded guilty to conspiring to possess with the intent to distribute marijuana, a violation of 21 U.S.C. § 841(a)(1); pursuant to 21 U.S.C. § 853, the Government seeks a money judgment against her in the amount of $3,068,000.00. Over Ms. Levesque's objections, the Court concludes: (1) that the Government is entitled to a money judgment for the value of the proceeds resulting from Ms. Levesque's participation in the marijuana trafficking conspiracy; (2) that the Information against Ms. Levesque adequately informed her that the Government would seek such a judgment; and, (3) that, in determining the amount of the criminal forfeiture, the Court will not consider either her relative culpability or her comparative lack of personal assets.

**I.      STATEMENT OF FACTS**

On October 10, 2006, a Maine State Trooper stopped Tammy Levesque's Chevrolet Avalanche on I-95 and approached her vehicle. As he came to the driver's window, he asked Ms. Levesque if there was anything she wanted to tell him; she replied: "I'm not going to lie to you, it is in the back." After opening the tailgate, the trooper observed three large hockey bags, emanating the distinct odor of marijuana. He asked Ms. Levesque what was in the bags and she confirmed "marijuana." She was right. There were ninety-four pounds of marijuana in the three hockey bags.

A federal criminal case ensued. On October 31, 2007, Ms. Levesque waived indictment and pleaded guilty to an Information, charging that from no later than February 1, 2006, to no earlier than October 10, 2006, she had conspired to distribute 100 kilograms or more of marijuana, a violation of 21 U.S.C. § 841(a)(1). *Information* (Docket # 2). The Information contained a forfeiture allegation, demanding that the Defendant forfeit "any and all property constituting or derived from any proceeds [she] obtained directly or indirectly as a result of the violation alleged in [the] Information." *Id.* In addition to pleading guilty on October 31, 2007, Ms. Levesque consented to the forfeiture.

On November 2, 2007, the Government moved pursuant to Rule 32.2(b)(1) for a preliminary order of forfeiture. *Government's Mot. for Prelim. Order of Forfeiture* (Docket # 9) (*Govt.'s Mot.*). The Government sought a money judgment in the amount of $3,068,000. Ms. Levesque objected. *Def.'s Memo. in Opp'n to Government's Mot. for Prelim. Order of Forfeiture* (Docket # 10) (*Def.'s Memo.*); *Def.'s Supplemental Resp. to Government's Mot. for Prelim. Order of Forfeiture* (Docket # 15) (*Def.'s Supp. Resp.*). On January 2, 2008, the Government replied to the objections raised by Ms. Levesque. *Government's Reply in Further Supp. of Mot. for Prelim. Order of Forfeiture* (Docket # 17).

In its Motion, the Government explained the basis for its demand. *Govt.'s Mot.* at 1-2. It stated that Ms. Levesque admitted that she had been making two to three marijuana runs per week between March 2006 and October 10, 2006, delivering "big bags" of marijuana. *Id.* at 2. The bags she was carrying on October 10, 2006, weighed 40-50 pounds and Ms. Levesque confirmed that the marijuana was worth $2,200 per pound. *Id.* In calculating the forfeiture amount, the Government assumed that Ms. Levesque made two runs per week for 18 weeks and that she delivered 40 pounds per trip, equaling 1,440 pounds. *Id.* Adding the 94 pounds she was

2

hauling on October 10, 2006, results in a total weight of 1,534 pounds; using a value of $2,000 per pound, the total equals $3,068,000.

Ms. Levesque has no quarrel with the Government's calculations or the final figure of $3,068,000 as representing the total value of the marijuana she hauled. However, she stresses that she never received anything approaching that sum of money. She says she was paid $2,000 per trip and, assuming she made 36 trips, she grossed approximately $72,000 from her illegal conduct. *Def.'s Supp. Resp.* at 1.

## II. DISCUSSION

### A. Whether the Government is Entitled to a Money Judgment in a Criminal Forfeiture Action

Ms. Levesque notes that the forfeiture statute, 21 U.S.C. § 853, does not refer to a money judgment and therefore, she argues, a money judgment is not authorized by the statutory language. *Def.'s Memo.* at 3. She refers to the Advisory Committee Notes to Rule 32.2 and argues that, although the Committee observed that a "number of cases have approved the use of money judgment forfeitures," the Committee declined to take a position "on the correctness of these rulings." *Id.* She has raised this issue "[i]n order to preserve her rights." *Id.*

The First Circuit has resolved this question. In *United States v. Hall*, the First Circuit reiterated that a "criminal forfeiture may take several forms [including] an in personam judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense." 434 F.3d 42, 59 (1st Cir. 2006) (quoting *United States v. Candelaria-Silva*, 166 F.3d 19, 42 (1st Cir. 1999)). As the First Circuit has ruled definitively, this Court owes deference to

3

that ruling. *Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004). The Government is entitled to a money judgment.[1]

### B.   Whether the Forfeiture Allegations in the Information Are Sufficient

Regarding the money forfeiture, the Information against Ms. Levesque alleged:

> As a result of committing the controlled substance offense alleged in Count One of this Information, the defendant shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting or derived from any proceeds said defendant obtained directly or indirectly as a result of the violation alleged in this Information, and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violations, including but not limited to:
>
> a.   Money Judgment:
>      A sum of United States currency to be determined by the Court, representing the amount of proceeds obtained as a result of the offenses alleged in Count One of this Information.

*Information* at 1-2. To obtain a criminal forfeiture, the Government must "include in the [charging document] notice of which property it plans to seek forfeiture of." *Misla-Aldarondo*, 478 F.3d at 74. *See* Fed. R. Crim. P. 7(c)(2) ("No judgment of forfeiture may be entered in a criminal proceeding unless the . . . information provides notice that the defendant has an interest in property that is subject to forfeiture in accordance with the applicable statute."). Ms. Levesque concedes that "the Government could seek forfeiture of a dollar amount against her, if it had alleged such dollar amount in a charging document." *Def.'s Memo.* at 4. But, she says that if the Government had reason to believe that she had any property that could be substituted for the illegal proceeds, it should have applied 21 U.S.C. § 853(p), which provides for the seizure and forfeiture of substitute assets. *Id.* at 5.

Ms. Levesque's argument runs counter to Rule 32.2, which establishes a process after a guilty plea to determine the amount of cash to be forfeited. Fed. R. Crim. P. 32.2(b)(1). She

---

[1] How the Government may enforce the money judgment is a different question, not raised here. *United States v. Misla-Aldarondo*, 478 F.3d 52, 74 (1st Cir. 2007).

improperly conflates two distinct concepts: a forfeiture of a particular asset and a money judgment for the proceeds derived from a drug trafficking offense. *See* Fed. R. Crim. P. 32.2 Advisory Committee Notes. For the former, the Government must establish the "requisite nexus" between the crime and the property; for the latter, the Rule says that "the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1). For a money judgment, however, the Government "need not prove that the defendant actually has the forfeited proceeds in his possession at the time of conviction." *Misla-Aldarondo*, 478 F.3d at 73 (quoting *Hall*, 434 F.3d at 59).

In either case, the Rule contemplates a judicial determination after the guilty plea "based on evidence already in the record, including any written plea agreement or, if the forfeiture is contested, on evidence or information presented by the parties at a hearing after the verdict or finding of guilt." Fed. R. Crim. P. 32.2(b)(1). The Government is not required to specify in its charging document what Rule 32.2 allows it to establish by proof after a guilty plea. *United States v. Yeje-Cabrera*, 430 F.3d 1, 15 (1st Cir. 2005) (noting that Rule 32.2 was amended in 1996 to provide notice of the forfeiture to the defendant and a reasonable opportunity to be heard).

### C. The Exercise of Discretion

Ms. Levesque vigorously presses the view that even if the Court could legally impose a forfeiture of $3,068,000, it should not. Ms. Levesque's primary contention is that she was a minor player in the drug conspiracy, that the proposed forfeiture is out of proportion to her net gains from the offense, and that she is penurious and, therefore, should not be subject to such an enormous forfeiture, one she can never reasonably expect to pay.

### 1. The Avalanche and Other Expenses of Drug Running

Ms. Levesque has not objected to the forfeiture of the Avalanche, but she contends that the equity she had in the Avalanche was derived from her illegal activity and, therefore, she will be penalized twice, forfeiting both the money she gained from illegal activity and the truck she purchased with that same money. *Def.'s Supp. Resp.* at 3 n.1. She explains that she bought the Avalanche on March 13, 2006, for $27,500.30. *Id.* at 2. She traded in a pickup for $8,000 and put $6,000 down in cash for a total of $14,000. *Id.* She financed the $13,500.30 difference, paying $377.76 monthly beginning April 2006 and ending October 2006 and paid $671.60 in insurance. *Id.* She calculates her total investment in the Avalanche, including expenses, to equal $20,315.92. *Id.* at 3. As Ms. Levesque was not reimbursed for mileage during her illegal trips and each trip cost about $300 to $400, she argues that her net proceeds should be reduced to reflect her expenses, which she calculates totaled $14,400.00. *Id.* at 2. Adding travel costs to the Avalanche purchase expenses, she totals $37,715.92 in expenses, which, she claims, should be deducted from her gross receipts to arrive at a net figure. Therefore, Ms. Levesque argues that the net figure, representing her actual profit from acting as a marijuana courier, should be $37,284.08.

### 2. Legitimate Expenses, Including Charitable Donations

Ms. Levesque claims that the Court should take into account her other legitimate expenses. She says she was interested in opening a beauty and tanning salon in Madawaska and spent $14,350.72 in materials for this business. *Def.'s Supp. Resp.* at 3. She incurred expenses for electricity, a building permit, business insurance, and other matters for a total of $17,967.68 for a business she never opened. *Id.* at 3-4. She thus contends that she netted only $19,316.40 and that she gave away about $7,200.00, leaving her with only about $12,000.00 in net proceeds

6

from her illegal activity, which she spent on ordinary living expenses, including – she concedes – vacations and clothing for her son and herself. *Id.* at 4. Ms. Levesque makes these calculations to prove her overall point: that "the Court [should] impose a reasonable amount of a money judgment that accounts for her *net* proceeds derived from her role in the offense, as well as other mitigating factors . . . ." *Id.* at 5.

### 3. Tammy Levesque and the Conspiracy

In focusing on her net gain from her participation in criminal activity, Ms. Levesque contradicts well established First Circuit authority. In *United States v. Hurley*, the First Circuit, interpreting an analogous RICO forfeiture provision, noted that Congress used the term, "proceeds," in lieu of the term "profits," to "alleviate the unreasonable burden on the government of proving net profits." 63 F.3d 1, 21 (1st Cir. 1995); *see Hall*, 434 F.3d at 59 ("The policy rationale for permitting a money judgment as part of a forfeiture in a racketeering case applies equally to a forfeiture in a drug case."). *Hurley* stated:

> [O]n reflection, it is only in degree that the courier who gets a very small cut differs from intermediaries who get a larger one, and from the leader of the drug ring who is effectively paying much of the money back to suppliers and servitors of various kinds.

63 F.3d at 21; *United States v. Reiner*, 500 F.3d 10, 18-19 (1st Cir. 2007). In *Misla-Aldarondo*, the First Circuit noted:

> If the Government has proven that there was at one point an amount of cash that was directly traceable to the offense, and that thus would be forfeitable under 18 U.S.C. § 982(a), that is sufficient for a court to issue a money judgment, for which the defendant will be fully liable whether or not he still has the original corpus of tainted funds -- indeed, whether or not he has any funds at all.

478 F.3d at 73-74. Under *Candelaria-Silva*, "criminal defendants are jointly and severally liable for forfeiture of the full amount of the proceeds of their criminal offense," 166 F.3d at 44, and as the First Circuit pointed out in *Hurley*, it "would be odd, although not impossible, to depart from

7

this principle of attributed conduct when it comes to apply the forfeiture rules, which have aspects of both substantive liability and of penalty." 63 F.3d at 22.

At a most basic level, the Court disagrees with Ms. Levesque's premises. To adopt Ms. Levesque's approach would require the Court to measure each co-conspirator's separate role within the overall conspiracy in generating illegal proceeds, to assess the distinct impact a defendant's actions within the greater conspiracy had on her own finances, to make value judgments about the actual use of ill-gotten gains, and to perform accounting-like determinations of the profit and expense ratios from the conspiracy.

It would be an exercise fraught with evidentiary difficulty ending in legal futility. After all, Ms. Levesque participated in an illegal enterprise. There is no evidence that this marijuana trafficking conspiracy operated under standard balance sheet accounting methods or that its financial operation would be susceptible to an attempt to trace and assess an individual co-conspirator's net contribution to the bottom line. Further, the forfeiture statute nowhere suggests that a court should delve into an individual defendant's personal finances, track and separate out her ill-gotten gains from her legitimate sources of income, and assess the forfeiture based on the defendant's actual use of her drug money.[2]

Instead, consistent with the "familiar rule that a member of a conspiracy is responsible for the foreseeable acts of other members of the conspiracy taken in furtherance of the conspiracy," the law holds a defendant liable for an amount of money that was foreseeable by her co-conspirators and herself, a policy that the First Circuit has described as "quite rational based on a proportionality analysis." *Hurley*, 63 F.3d at 22-23.

---

[2] Commendable as it may be that Ms. Levesque gave a substantial percentage of her drug money to charity, her beneficence with ill-gotten gains does not relieve her of her own criminal responsibility for participating in an illegal drug trafficking operation.

Even assuming that the Court could somehow dice among degrees of culpability within this conspiracy's co-conspirators, it would not do so here. The marijuana Ms. Levesque delivered was smuggled into the United States in a trailer with a hidden compartment; the value of the marijuana Ms. Levesque herself transported exceeded three million dollars; in the span of a little more than six months, she undertook at least 36 separate trips to East Coast drug dealers from North Carolina to Massachusetts; and, Ms. Levesque received $2,000 per trip.[3] Although Ms. Levesque was a courier, her role in the marijuana smuggling conspiracy was essential and, as *Hurley* stated, for forfeiture purposes, the distinctions among courier, intermediary, and ring leader are "only in degree."[4] 63 F.3d at 21.

## III. CONCLUSION

The Court overrules the Defendant's objections to the Government's Motion for Preliminary Order of Forfeiture (Docket #'s 10 & 15).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of January, 2008

---

[3] In its calculations, the Government gave Ms. Levesque the benefit of every doubt. She said that she went two to three times per week, that (except for a six week vacation) she did so from March to October 10, 2006, that she received large duffel bags of marijuana for the trips, that each bag had between 40 and 50 pounds of marijuana, and that the marijuana was worth $2,200 per pound. In its calculations, the Government used two trips per week, assumed 40 pounds per trip, gave her the six week vacation, and applied $2000 per pound. If the higher figures are used – 3 times per week, $2,200 per pound, and 94 pounds (based on the amount she possessed the date of her arrest) – the gross proceeds figure escalates from $3,068,000 to over $11,000,000.00. Accepting Ms. Levesque at her word on her $2,000 flat fee, the higher figure of three times per week for the same period results in her receipt of $108,000.

[4] Finally, even though there is no sign that Ms. Levesque can begin to pay such a money judgment, the judgment, as the First Circuit pointed out, runs into the future. *Misla-Aldarondo*, 478 F.3d at 75. If Ms. Levesque is fortunate in the future to legitimately come into money, the Government would have a right within certain constraints to extract its share of her good fortune.